**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DTEX, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-0188 |
| | § | |
| BBVA BANCOMER, S.A., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

In January 2006, Dtex, L.L.C. ("Dtex"), a South Carolina company that trades in used textile equipment, sued BBVA Bancomer, S.A., Institution de Banca Grupo Financiero BBVA Bancomer ("Bancomer"), a Mexican banking corporation that maintains a permanent foreign bank agency in Houston, Texas.  In both the original and amended complaints, Dtex sought damages for tortious interference with contract, intentional interference with prospective contractual relations, and conversion.  (Docket Entries No. 20, 33).  The claims arose from Bancomer's alleged interference with Dtex's rights to certain textile equipment, which Dtex purchased in Mexico in an auction sponsored by the Mexican government.  Bancomer asserted a lien on the same textile equipment.  Dtex's and Bancomer's competing claims to the equipment has been the subject of extensive and numerous legal proceedings in Mexican courts since 2002.

Dtex filed two lawsuits in the United States challenging Bancomer's actions with respect to the textile equipment in Mexico.  In July 2004, Dtex sued Bancomer in the United

States District Court for the District of South Carolina, asserting most of the causes of action later alleged in this case.  (Docket Entry No. 30).  That case was dismissed for lack of personal jurisdiction.  Dtex then sued Bancomer in this court.

Bancomer's pending amended motion to dismiss is based on comity or *forum non conveniens*.  (Docket Entry No. 45).  Dtex has responded to the motion, (Docket Entry No. 50), Bancomer has replied, (Docket Entry No. 61), Dtex has surreplied (Docket Entry No. 66), and Bancomer has filed a surresponse, (Docket Entry No. 67).[1]

Based on a careful review of the pleadings, the motion to dismiss and response, the parties' submissions, and the applicable law, this court grants Bancomer's motion to dismiss on the basis of *forum non conveniens*.  (Docket Entry No. 45).  The reasons are set out below.

## I.    Background

The dispute between Bancomer and Dtex began with loans by Bancomer to a Mexican textile manufacturer located in Chihuahua, Mexico.  That textile manufacturer, Denimtex, S.A. de C.V., borrowed approximately $30 million from Bancomer from 1994 through 2000. Bancomer claims that it received a first priority lien on certain textile equipment, including equipment at the Denimtex plant in Chihuahua, as security for the loans.

In 2000, Denimtex defaulted on the loans.  In 2001 and 2002, Bancomer was involved in collection actions against Denimtex in Mexican courts, obtaining judgments.  In 2002, in

---

[1]  Bancomer's earlier challenge to personal jurisdiction was withdrawn; Bancomer has  consented to *in personam* jurisdiction in this case.  (Docket Entry No. 46 at 9).  Bancomer's earlier motion to stay pending the appeal from the dismissal of the South Carolina case is moot; the dismissal was affirmed on appeal.  (Docket Entry No. 62).

one of the foreclosure proceedings, the court appointed a judicial administrator to secure the equipment at the Denimtex plan on Bancomer's behalf.  Dtex alleges that this administrator, Duarte Sanchez, was "hand-picked" by Bancomer and was "not an 'independent' judicial administrator, officer, or agent.  He is in every respect Bancomer's man.  He represents Bancomer's interests."  (Docket Entry No. 51 at 7– 8).  Bancomer asserts that Sanchez was independent and that his selection and activities were subject to court oversight.  (Docket Entry No. 46 at 5, Ex. B at 2; Docket Entry No. 61, Ex. B at 19).

In 2001, the Denimtex plant employees' union sued Denimtex for unpaid wages.  In December 2001, the Mexican Labor Board granted the employees an award and judgment for the workers' wage claims.  The Labor Board attached Denimtex's property, including the textile equipment at the plant, to secure the wage claims and conducted an auction of the equipment.  Dtex asserts that the wage claims had a first priority lien on Denimtex's assets, superior to all existing claims, and that the tribunal conducting the auction published written notices of the auction as required by Mexican law.  (Docket Entry No. 52 at 13–15).

In July 2002, Dtex submitted a winning bid at the auction for the equipment, 37,887,120 Mexican pesos (approximately $3,866,850).  (Docket Entry No. 50 at 2).  Dtex transferred the funds from its headquarters in South Carolina to the Labor Board in Mexico City.  On July 25, 2002, Dtex entered into a contract to sell the equipment to a third party, Gibbs International, Inc., for $7,950,000.  (Docket Entry No. 46, Ex. D at 17).

In August 2002, Bancomer filed a legal proceeding with the tribunal that had conducted the auction, challenging the validity of the auction under Mexican law.  (Docket

3

Entry No. 50 at 3; Docket Entry No. 46 at 4).  Bancomer asserted that despite its status as the first-priority secured lienholder, it had not received proper notice of the auction and as a result had not submitted a bid.  Dtex was not a party to this proceeding.  Dtex alleged that Bancomer "falsely and fraudulently misrepresented to the Labor Board that, if it would conduct [another] auction, the defendant might find a third party to bid more money."  (Docket Entry No. 20 at 8).  On October 10, 2002, the tribunal ruled against Bancomer.

On October 28, 2002, Bancomer filed a proceeding called an "Amparo Indirecto" in a court in Mexico City, alleging that the tribunal conducting the auction had violated Bancomer's rights.  (Docket Entry No. 50 at 4).  At that time, Dtex was not a party in the proceeding.  In the Mexico City Amparo proceeding, the court granted Bancomer's request for a stay preventing any entity, including Dtex, from taking possession of the textile equipment pending a full hearing.  Bancomer was required to post a significant bond as a condition for the stay order.[2]  The stay was issued on December 6, 2002.  On January 8, 2003, the court that had issued the stay ruled against Bancomer, dismissing its claim.  (Docket Entry No. 20 at 9).  Decisions in subsequent appeals, issued on February 21 and May 14, 2003, affirmed this result.  Dtex alleges that in the Mexico City Amparo proceeding, Bancomer used "its vast financial resources, as well as its tremendous influence and political power throughout Mexico" to obtain the stay "with the knowledge that it was not legally entitled to upset the plaintiff's winning bid."  (Docket Entry No. 20 at 10).  Dtex acknowledges that

---

[2]  The bond was for 37,887,120 Mexican pesos.  (Docket Entry No. 51 at 6; Docket Entry No. 68, Ex. 1 at 2; Docket Entry No. 71, Ex. A).

despite these efforts, the Mexican courts ruled against Bancomer.  Dtex asserts that under Mexican law, the May 14, 2003 judgment fully disposed of Bancomer's challenge to the auction; Dtex claims the decision is *res judicata* as to Bancomer's claim that it owns the textile equipment.  (Docket Entry No. 50 at 4-5; Docket Entry No. 52 at 14).

Dtex alleges that Sanchez violated the stay order that had been issued in the Amparo and seized possession of the equipment "through threats of violence and actual acts of violence."  (Docket Entry No. 20 at 12).  Dtex alleges that after May 14, 2003, when the Mexican court determined that Dtex owned the equipment, Bancomer or Sanchez kept possession of the equipment by posting security guards and blocking Dtex.  (Docket Entry No. 20 at 13; Docket Entry No.  50 at 5).  Dtex alleges that in December 2003, even after it received an order allowing it to take possession of the equipment, Bancomer or Sanchez used security guards to prevent that from occurring.  (Docket Entry No. 20 at 13-14).

On December 16, 2003, Sanchez filed a second Amparo action, this one in Chihuahua, Mexico seeking to invalidate the rulings in Dtex's favor and asking for a stay to prevent Dtex from taking the equipment.  (Docket Entry No. 50 at 7; Docket Entry No. 56 at 5).  Dtex alleges that Bancomer, through Sanchez, fraudulently failed "to disclose to that court the fact that Denimtex was out of business."  (Docket Entry No. 20 at 12).  On January 4, 2004, however, before Sanchez had posted the bond required for a stay, the Labor Board issued orders that allowed Dtex to take the equipment and store it in a Denimtex storage facility.  On January 15, 2004, Sanchez posted the bond in the Chihuahua Amparo case, which prevented Dtex from removing the equipment from the Denimtex storage facility.  Dtex alleges that this

stay was obtained in bad faith and that Bancomer, through Sanchez, "falsely and fraudulently omitted to disclose to the Mexican court the material fact that the equipment had already been purchased by the plaintiff and was the plaintiff's property." (Docket Entry No. 20 at 11, 16). Dtex also alleges that on January 16, 2004, "25–30 'thugs' hired by the defendant suddenly and without warning showed up at the Denimtex plant and attempted by force to gain entry into the secured Denimtex facility where the plaintiff's equipment was stored." (Docket Entry No. 30 at 19). The police prevented that from occurring. (*Id*. at 20). Dtex alleges that the individual that led "the mob" "approached the plaintiff's Mexican lawyer and offered him a bribe, stating that Bancomer would pay [the lawyer] a monthly bribe if he would allow the [Bancomer's] agents to have access" to the equipment. (*Id*.). Dtex also alleges that Bancomer "posted people just outside the Equipment site" starting on January 18, 2004. (*Id*.).

On December 3, 2004, the Federal Labor Court denied the Chihuahua Amparo action Sanchez had filed, and the First Collegiate Tribunal in Civil and Labor Matters in Chihuahua denied the appeal on April 14, 2005. (Docket Entry No. 46 at 5; Docket Entry No. 50 at 8). Bancomer asserts that Dtex appeared and participated in these proceedings, which ended in Dtex's favor. (Docket Entry No. 46 at 5). Dtex denies that it was a party to the proceedings but agrees that the courts ultimately ruled against the judicial administrator who was acting on Bancomer's behalf. (Docket Entry No. 50 at 8).

On November 13, 2003, Dtex filed an ancillary action to the Mexico City Amporo against Bancomer, seeking to recover against the bond that Bancomer had posted in that case. Dtex asserted a right to damages allegedly resulting from its inability to remove and sell the

6

equipment for the period the stay was in effect, December 6, 2002 to May 14, 2003.  (Docket Entry No. 56 at 5).  Dtex specifically sought damages resulting from its inability to perform the July 2002 contract to sell the equipment to Gibbs International, Inc., including lost profits. (*Id*.).  Dtex claims that despite filing this ancillary motion against Bancomer's Amparo bond, it was not a party to the Amparo proceeding under the Mexican Federal Amparo Act.  (Docket Entry No. 51 at 30; Docket Entry No. 52 at 13).  Bancomer argues that under Mexican law, Dtex became a party in the Amparo proceeding.  (Docket Entry No. 61, Ex. B).

Dtex's attorney in Mexico, Juan Carlos Hernandez Martinez, stated in his affidavit that he was offered a bribe and threatened in order to induce him to dismiss Dtex's ancillary motion.  (Docket Entry No. 51 at 18).  He did not dismiss the case.  In May 2004, the Federal Labor Court ruled in Dtex's favor, finding that it was entitled to the equipment as the purchaser at the auction and entitled to damages.  The damages compensated Dtex for its inability to consummate the Gibbs contract but did not include lost investment profits. (Docket Entry No. 46, Ex. D at 3).  Bancomer appealed.  In August 2006, the Mexican court issued a new decision, ruling that Bancomer's Mexico City Amparo action had been "groundless and illegal" and that Dtex had suffered damages because the stay prevented the sale of the equipment under the Gibbs contract.  (*Id*. at 20–23).  The court awarded Dtex damages in the amount of  39,242,190 Mexican pesos, significantly more than the bond Bancomer had been required to post.  (*Id*. at 40).[3]  The court did not award the lost profits

---

[3]  The 39,242,190 pesos awarded as damages is the sale price (using the conversion rate at the time of contracting) minus the purchase price, or 77,129,310 Mexican pesos less 37,887,120 Mexican pesos.  (*Id*. at 40).

sought by Dtex for the interest that would have been paid on the principal invested, or 1,704,920.40 Mexican pesos. (*Id*. at 43). The court found that these damages were not allowed under Article 2109 of the Mexican Federal Civil Code. (*Id*. at 44). Both Bancomer and Dtex appealed this decision, which was affirmed in November 2006. (Docket Entry No. 46 at 11; Docket Entry No. 61 at 2).

The parties have presented conflicting affidavits as to whether the Mexican court issuing the damages award had jurisdiction to consider certain damages elements. Dtex asserts that the damages it sought in the two lawsuits filed in the United States district courts were not within the Mexican court's jurisdiction. (Docket Entry No. 50 at 10, 13; Docket Entry No. 52 at 33). Bancomer argues that the August 2006 judgment of the Mexican court precludes Dtex's damages claims in this case and supports dismissal on the basis of comity.

The parties have also submitted evidence about the resulting collection of the damages award from the ancillary proceeding. Dtex's Mexican attorney claims that after the November 2006 decision, he requested payment from the bonding company, Fianzas Monterrey, S.A. (Docket Entry No. 68, Ex. 1 at 2). Fianzas is owned by New York Life International, L.L.C., which is owned by New York Life Insurance Company. (Docket Entry No. 68 at ¶ 7). Dtex alleges that Fianzas sent a letter to Dtex about why it was refusing to pay the bond. In that letter, translated by Jorge Vargas, Fianzas states that Bancomer advised Fianzas that procedural defects in the underlying proceedings should be corrected. (Docket Entry No.68, Ex. 2-3 at 1). The letter states that Fianzas should have been made a party to Dtex's ancillary action. The letter cites Mexican statutory and judicial precedent to support this argument.

8

(*Id*. at 2).  Dtex characterizes the letter as Bancomer "using its power and influence in Mexico to manipulate the entire justice system."  (Docket Entry No. 68 at 5).

Bancomer denies these allegations but acknowledges that in January 2007, Fianzas challenged its duty to proffer the bond in the ancillary proceeding.  Fianzas's challenge was rejected on March 12, 2007.  On that date, Fianzas wrote to Dtex, stating that it would pay immediately.  (Docket Entry No. 71 at 1–2).  On March 13, 2007, Fianzas submitted a check to Dtex in the amount of 39,242,190 Mexican pesos, the full amount of the damages awarded in the ancillary proceeding.  Bancomer submitted a copy of that check.  (Docket Entry No. 71, Ex. A).  Dtex confirms that it has received payment.  (Docket Entry No. 72 at 4).[4]

Dtex alleges that in January 2004, while the damages action was pending in Mexico, Bancomer filed a third Amparo proceeding.  (Docket Entry No. 20 at 16; Docket Entry No. 51 at 17).  Dtex alleges that Bancomer started this proceeding in the Civil District Federal Court in Mexico City, which lacked jurisdiction in the case.  Dtex alleges that Bancomer agents misled the court about jurisdictional facts.  It is undisputed that the Mexican court dismissed this Amparo action and that the dismissal was upheld on appeal on September 23, 2004.  (Docket Entry No. 51 at 17).

In July 2004, workers allegedly bribed by Bancomer to block Dtex's sale of the equipment allowed Dtex to begin removing equipment.  (Docket Entry No. 20 at 22).  Dtex alleges that Bancomer, by paying police agents, "caused the Mexican federal police to stop

---

[4]  Dtex's motion to supplement the record with the materials submitted on this issue is granted. (Docket Entry No. 68, duplicated at Docket Entry No. 69, 70).  Dtex's motion to take additional discovery is denied.  Dtex argues that this evidence would further show Bancomer's "power and influence" in Mexican courts.  (Docket Entry No. 72).  The record shows that the damages award has been fully paid.

two of the plaintiff's trucks which were attempting to remove some of the Equipment. . . . The Mexican federal police arrested the truck driver, secured their trucks and trailers and ordered the plaintiff not to remove any more of the Equipment." (*Id.*; Docket Entry 51 at 35)

Bancomer argues that despite the extensive litigation, title to the equipment remains unclear because of proceedings pending in a Mexican bankruptcy court. Bancomer asserts that on August 6, 2002, a Denimtex creditor not involved in this case, Clariant (Mexico) S.A. de C.V., began an involuntary bankruptcy proceeding against Denimtex in Mexico. (Docket Entry No. 46 at 6). On January 30, 2004, the Mexican bankruptcy court found that the Denimtex bankruptcy was effective on May 15, 2002, two months before the auction at issue in this case. (*Id.*). Bancomer alleges that the order appointed a receiver for Denimtex, Jorge Abraham Gonzalez Anchondo, C.P.A., who was to take possession of all Denimtex's property, including the textile equipment. According to Bancomer, the equipment "disappeared" from Anchondo's custody in December 2003. On May 17, 2004, the bankruptcy court ruled that Anchondo was responsible for the loss. Bancomer sought a declaration that the equipment was the property of Denimtex's bankruptcy estate and that the auction was invalid. The Mexican bankruptcy court has not ruled on this issue or on the effect of the May 2003 judgment that Dtex owns the equipment. Bancomer alleges that until the bankruptcy court rules, title to the equipment remains unclear. (Docket Entry No. 46 at 7). Dtex argues that the bankruptcy proceeding does not involve the issues present in this case, will not deal with the issue of who owns the textile equipment, and that the final judgment issued on May 14, 2003 by the Federal Circuit Court against Bancomer is *res judicata* as to

ownership.  (Docket Entry No. 51 at 20–22; Docket Entry No. 52 at 17, 24–26).   In addition to the Mexican civil proceedings, pending and concluded, relating to the equipment, there were also Mexican criminal proceedings.  On January 16, 2004, Dtex's attorney in Mexico, Luis Manual Millan Albarran, filed a criminal complaint against Sanchez and a Bancomer representative, Monica Hernandez Nyala, alleging robbery, fraud, perjury, and other offenses. The Mexican prosecutor investigated these claims but did not file charges.  The matter was dismissed on February 6, 2004.  (Docket Entry No. 46 at 7).

In January or February 2004, Sanchez filed felony criminal complaints against two American officers of Dtex, Jimmy Gibbs and Brian Honeycutt, Dtex's Mexican attorney, Hernandez Martinez, and one of Dtex's Mexican representatives.  (Docket Entry No. 20 at 18; Docket Entry No. 51 at 34).  Bancomer claims that these complaints were in response to the criminal complaints Dtex had filed.  (Docket Entry No. 46 at 7).  Dtex claims that its officers were afraid to return to Mexico after Sanchez's complaint was filed.  Dtex alleges that in February 2004, Bancomer filed additional criminal complaints against Dtex's American officers and Mexican attorney.  In May 2004, a Mexican federal district court dismissed the criminal charges.  Dtex argues that its American officers nevertheless "feel that they can no longer safely travel to Mexico to carry on the business affairs of the plaintiff for fear of being illegally arrested and imprisoned on false and sham charges initiated by or at the behest of the defendant."  (*Id.* at 22).  Bancomer responds that these charges were resolved on November 24, 2004, when the prosecutor's request to pursue charges was denied.  (Docket Entry No. 46

at 7).  The parties agree that there is no pending criminal investigation, outstanding warrant, or ongoing criminal proceeding in Mexico related to this case.

On July 13, 2004, Dtex filed the South Carolina suit against Bancomer.  On October 5, 2004, Bancomer moved to dismiss for lack of personal jurisdiction.  After discovery on jurisdiction, the South Carolina court dismissed the action on December 20, 2005.  The dismissal order was affirmed on appeal on January 17, 2007.  (Docket Entry No. 62, Ex. A).

Dtex filed this suit after the federal district court dismissed the South Carolina suit for lack of personal jurisdiction.  Bancomer has moved to dismiss this suit on two grounds: international comity and *forum non conveniens*.  Much of the evidence and argument the parties presented is focused on comity.  Because, as set out below, this court grants the motion to dismiss on the basis of *forum non conveniens*, it does not reach comity, the alternative ground for dismissal.

## III.    The Legal Standard for Dismissal Based on Forum Non Conveniens

A federal court sitting in diversity applies the federal law of *forum non conveniens* in deciding a motion to dismiss in favor of a foreign forum.  *In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d 1147, 1159 (5th Cir. 1987) (*en banc*), *vacated on other grounds sub. nom.*, *Pan Am. World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989), *reinstated except as to damages by In re Air Crash Disaster Near New Orleans, La.*, 883 F.2d 17 (5th Cir. 1989)(*en banc*); *De Aguilar v. Boeing Co.*, 11 F.3d 55, 59 (5th Cir. 1993).  "The *forum non conveniens* determination is committed to the sound discretion of the trial court.  It may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant

12

public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981); *see also McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 423 (5th Cir. 2001).

The "doctrine of *forum non conveniens* proceed[s] from [the] premise [that] . . . [i]n rare circumstances, federal courts can relinquish their jurisdiction in favor of another forum." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 722 (1996) (emphasis omitted). Building on its holding in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947), the Supreme Court set out the framework for analyzing *forum non conveniens* in an international context in *Piper Aircraft*. First, "the court must determine whether there exists an alternative forum." *Piper Aircraft*, 454 U.S. at 254, n.22. The court considers the amenability of the defendant to service of process and availability of an adequate remedy in the alternative forum. *See Piper Aircraft*, 454 U.S. at 254-55 n.22; *see also McLennan*, 245 F.3d at 424; *Gonzalez v. Chrysler Corp.*, 301 F.3d 377 (5th Cir. 2002), *cert. denied*, 539 U.S. 1012 (2003). Second, the court must determine which forum is best suited to the litigation. *See Piper Aircraft*, 454 U.S. at 255. In performing this second step, a court must consider whether "certain private and public interest factors weigh in favor of dismissal." *McLennan*, 245 F.3d at 424. The court must bear in mind that "the ultimate inquiry is where trial will best serve the convenience of the parties and the interests of justice." *In re Air Crash*, 821 F.2d at 1162 (quoting *Koster v. Am. Lumbermens Mutual Casualty Co.*, 330 U.S. 518, 527 (1947)). The defendants bear the burden of proof on all elements of the *forum non conveniens* analysis. *In re Air Crash*, 821 F.2d at 1164.

13

The "private interest" factors include:

> (i) the relative ease of access to sources of proof; (ii) availability
> of compulsory process for attendance of unwilling, and the cost
> of obtaining attendance of willing, witnesses; (iii) possibility of
> view of [the] premises, if view would be appropriate to the
> action; (iv) all other practical problems that make trial of a case
> easy, expeditious and inexpensive . . . enforceability of judgment
>  [; and whether] the plaintiff [has sought to] "vex," "harass," or
> "oppress" the defendant.

*Gulf Oil*, 330 U.S. at 508; *In re Air Crash*, 821 F.2d at 1162.

The "public interest" factors include:

> (i) the administrative difficulties flowing from court congestion;
> (ii) the local interest in having localized controversies resolved
> at home; (iii) the interest in having a the trial of a diversity case
> in a forum that is familiar with the law that must govern the
> action; (iv) the avoidance of unnecessary problems in conflicts
> of law, or in application of foreign law; and (v) the unfairness of
> burdening citizens in an unrelated forum with jury duty.

*See Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 342 (5th Cir. 1999); *In re Air Crash*, 821 F.2d at 1162-63.

The defendant carries the burden of persuading the court that a lawsuit should be dismissed on *forum non conveniens* grounds. *In re Ford Motor Co., Bridgestone/Firestone North American Tire*, 344 F.3d 648, 652 (7th Cir.2003). Ordinarily a strong favorable presumption is applied to the plaintiff's choice of forum. "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).

However, the plaintiff's choice of forum is not dispositive. *See, e.g., Piper Aircraft*, 454 U.S. at 255-56; *Wilson v. Humphreys (Cayman) Limited*, 916 F.2d 1239, 1246 (7th Cir.

14

1990).  Judicial concern for allowing citizens of the United States access to American courts has been tempered by the expansion and realities of international commerce.  When an American corporation doing extensive foreign business brings an action for injury occurring in a foreign country, many courts have partially discounted the plaintiff's preference of a United States forum.  As the Ninth Circuit  reiterated: "In an era of increasing international commerce, parties who choose to engage in international transactions should know that when their foreign operations lead to litigation they cannot expect always to bring their foreign opponents into a United States forum when every reasonable consideration leads to the conclusion that the site of the litigation should be elsewhere."  *Contact Lumber Co. v. P.T. Moges Shipping Co., Ltd.*, 918 F.2d 1446, 1450 (9th Cir.1990) (quoting *Baychem Corp.*, *Mizokami Bros. of Ariz., Inc. v. Baychem Corp.*, 556 F.2d 975, 977 (9th Cir. 1977)); *see also Lehman v. Humphrey Cayman, Ltd.*, 713 F.2d 339, 346 (8th Cir. 1983) (quoting *Founding Church of Scientology v. Verlag,* 536 F.2d 429, 435 (D.C. Cir.1976)).

These factors and principles are applied to the record before this court.

## IV.    Analysis

### A.    The Challenges to the Evidence

The parties have submitted the following evidence:  affidavits of Bancomer attorneys

I. Faison Hicks[5] and Juan Carlos Hernandez Martinez;[6] a declaration of Bancomer attorney Jose Antonio Lechuga Vega;[7] and Vega's declaration in opposition to the affidavit of Hernandez Martinez.[8]  Both parties have submitted affidavits by experts on Mexican law. Dtex submitted an affidavit of Professor Jorge A. Vargas,[9] and Bancomer submitted an affidavit of Roberto Genis Gonzalez-Mendez.[10]  The record also contains the declaration of Alvaro Meza about Bancomer's corporate status,[11] a letter to Dtex translated by Vargas,[12] a

---

[5] Docket Entry No. 53.  Bancomer has objected to several paragraphs in Hicks's affidavit.  (Docket Entry No. 60).  Bancomer objects to paragraphs 5 and 6 as cumulative and not the best evidence.  Bancomer objects to paragraph 7 as irrelevant, cumulative, and not the best evidence.  These paragraphs are Hicks's summary of legal proceedings in Texas involving Bancomer.  Because Bancomer has withdrawn its challenge to *in personam* jurisdiction, the objection to paragraph 5–7, the list of cases in which Bancomer has stipulated to *in personam* jurisdiction in Texas, is moot.

[6] Docket Entry No. 51; Docket Entry No. 68, Ex. 1.  Bancomer has objected to several paragraphs in Hernandez Martinez's original affidavit.  Bancomer objects to paragraphs 4, 8, 9, 15, 22, 33, 35, 36, 37, as improper lay opinions about Mexican law.  These objections are overruled. Hernandez Martinez, a Mexican attorney, is qualified under Federal Rules of Civil Procedure 701 and 702 to offer opinions about Mexican law.  Bancomer has objected to paragraph 40 as a lay opinion.  This objection is overruled except for Hernandez Martinez's speculation about what Bancomer knew or would do in the future.

Bancomer has objected to paragraphs  7, 10, 12, 14, 16, 17, 19, 21, 23, 25, 26, 27, 34, 36, and 38. Bancomer argues that Hernandez Martinez's characterization of Bancomer's Mexican legal proceedings is not the best evidence.  Given the difficulties of obtaining and translating documents from the Mexican proceedings, and the fact that Bancomer's expert gave similar testimony, these objections are overruled.

Bancomer has objected to paragraphs 5, 6, 13, 18, 20, 28, and 30, based on lack of personal knowledge.  These paragraphs contain speculation about Bancomer's activities.  The objections are sustained. The objection to paragraph 31 is granted on the basis that the statement is speculative.  The objections to paragraph 29 are overruled; this alleged statement is an admission.

[7] Docket Entry No. 46, Ex. B.

[8] Docket Entry No. 61, Ex. A.

[9] Docket Entry No. 52.

[10] Docket Entry No. 61, Ex. B, C, D.

[11] Docket Entry No. 46, Ex. A.

[12] Docket Entry No. 68, Exs. B-2, B-3.

supplemental affidavit by Vargas,[13] a check to Dtex,[14] the Mexican Constitution,[15] and an official translation of Dtex's June 30, 2006 Mexican damages award.[16]

### B.    The Adequacy and Availability of the Foreign Forum

A foreign forum is available when the entire case and all the parties can come within that forum's jurisdiction. *Baumgart*, 981 F.2d at 835 (quoting *In re Air Crash*, 821 F.2d at 1164). A foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the all the benefits of an American court. *Id*. "The substantiative law of the foreign forum is presumed to be adequate unless the plaintiff makes some showing to the contrary, or unless conditions in the foreign forum made known to the court, plainly demonstrate that the plaintiff is highly unlikely to obtain basic justice there." *Tjontveit v. Den Norske Bank ASA*, 997 F. Supp. 799, 805 (S.D. Tex. 1998) (citing *Empresa Lineas Maritimas v. Schichau-Unterweser*, 955 F.2d 368, 372 (5th Cir. 1992)).

Both parties presented experts on Mexican law. Bancomer's expert on Mexican law testified that Mexican law and judicial system are competent, fair, and adequate to address the claims in Dtex's complaint. (Docket Entry No. 61, Ex. B at 7–9). In a Mexican tort case based on the facts alleged, Dtex could pursue monetary damages for property loss, loss of

---

[13] Docket Entry No. 68, Ex. B-1.

[14] Docket Entry No. 71, Ex. A.

[15] Docket Entry No. 56, Ex. C; Docket Entry No. 61, Exs. E–K.

[16] Docket Entry No. 46, Ex. D.

business, loss of use, and other claims.  (*Id.* at 8).  "Mexico's court system would allow Dtex to bring claims for monetary damages based on the facts as alleged."  (*Id.*).  Dtex's expert testified that Mexican law would allow some damages, but does not recognize "tortious interference with contact, interference with prospective contractual relations, or conversion." (Docket Entry No. 52 at 33).  Under Mexican law, Dtex could not obtain damages for injury to reputation, operating losses, depreciation losses, equipment maintenance and security costs, attorneys' fees, or punitive damages.  (*Id.*).

"Adequacy" does not require that the alternative forum provide the same relief as an American court.  A number of Fifth Circuit cases have held that Mexico is an adequate forum for  litigation, despite differences in Mexican and American substantive and procedural law. *See Vazquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 672 (5th Cir. 2003) (finding Mexico an adequate forum despite limits on damages);  *Gonzalez*, 301 F.3d at 383 (affirming the dismissal of suit against American automobile manufacturer on the basis of *forum non conveniens* in case arising from accident in Mexico); *Zermeno v. McDonnell Douglas Corp.*, 246 F. Supp. 2d 646, 659 (S.D. Tex. 2004); *Seguros Comercial Americas S.A. De C.V. v. American President Lines, Ltd.*, 933 F. Supp. 1301, 1309 (S.D. Tex. 1996) (finding Mexico an adequate forum for commercial law dispute); *De Aguilar v. Boeing Co.*, 806 F. Supp. 139 (E.D. Tex. 1992) (dismissing on the basis of *forum non conveniens* a case involving the crash in Mexico of an American-designed and manufactured aircraft operated by a Mexican airline), *aff'd*, 11 F.3d 55 (5th Cir. 1993).

In *Gonzalez*, 301 F.3d at 380, a wrongful death case, the plaintiff argued that the facts that Mexican law did not recognize strict liability and capped damages at approximately $2,500 made the Mexican courts inadequate.  The court found that "Mexico, as a sovereign nation, has made a deliberate choice in providing a specific remedy for this tort cause of action.  In making this policy choice, the Mexican government has resolved a trade-off among the competing objectives and costs of tort law."  *Id.* at 381.  "It would be inappropriate—even patronizing—for us to denounce this legitimate policy choice by holding that Mexico provides an inadequate forum."  *Id.* at 382.  Similarly, the Fifth Circuit has held that the absence of a remedy for civil RICO claims does not make a foreign forum inadequate.  *See Kempe v. Ocean Drilling and Exploration Co.*, 876 F.2d 1138, 1146 (5th Cir. 1989).  The absence of a remedy for violating the Texas Deceptive Trade Practices Act also does not make a forum inadequate.  *See Constructora Spilimerg, C.A. v. Mitsubishi Aircraft*, 700 F.2d 225, 225 (5th Cir. 1983).

In this case, Mexican law may limit some categories of damages that Dtex may recover for the tortious conduct it alleges.  But the record makes clear that Mexican law recognizes Dtex's claims for relief and makes significant damages available for those claims.  A Mexican court has already awarded Dtex 39 million Mexican pesos in its ancillary action to recover damages sustained as a result of the stay Bancomer obtained in the Mexico City Amparo proceeding.  (Docket Entry No. 46, Ex. D at 20–26).  Dtex argues that the amount of damages would be more limited under Mexican as opposed to American law, not that it would have no claim or no ability to recover.  Courts have consistently rejected such limits as the basis for

19

finding Mexican courts an inadequate alternative forum.  *See Gonzalez*, 301 F.3d 377; *De Aguilar v. Boeing Co.*, 806 F. Supp. 139 (E.D. Tex. 1992), *aff'd,* 11 F.3d 55 (5th Cir. 1993); *Zermeno v. McDonnell Douglas Corp.*, 246 F. Supp. 2d 646 (S.D. Tex. 2003).

Dtex also argues that Mexico is not an adequate alternative forum because Bancomer has misused the Mexican legal system in the past by filing legal actions in bad faith and creating delays that have prejudiced Dtex and interfered with its rights in the textile equipment.  Dtex asserts that "conditions in the foreign forum plainly demonstrate that [Dtex is] highly unlikely to obtain basic justice" in Mexico against Bancomer in this dispute. (Docket Entry No. 50 at 25).  The record does not support this argument as a basis for finding the Mexican forum inadequate.  Mexican tribunals have consistently ruled against Bancomer's claims to the equipment at issue.  A Mexican tribunal has awarded, and Dtex has collected, millions of Mexican pesos in damages against Bancomer.  Dtex has shown no evidence that the Mexican courts will treat it unfairly so as to make those courts an inadequate alternative forum.

Dtex also argues that Bancomer used its "political and economic power in Mexico with local police and prosecutors to cause Mexican authorities to issue totally baseless and fraudulent, but nevertheless very real and intimidating, criminal arrest warrants for Dtex's two Mexican lawyers and two of its key U.S. personnel (both of whom will be key witnesses in this case)."  (Docket Entry No. 50 at 25-26).  The record shows that all of the criminal proceedings related to this case were dismissed in 2004.  There is no evidence of any outstanding warrant or other threat to the Dtex agents' safety, preventing them from traveling

to Mexico.  The record shows that despite the past criminal complaints, Dtex has continued related litigation in Mexican tribunals as recently as November 2006.  (Docket Entry No. 46 at 11; Docket Entry No. 61 at 2).  The record also shows that Mexican tribunals, government authorities, and police repeatedly aided Dtex in its attempts to secure the equipment at issue. (Docket Entry No. 20 at 12, 13, 17, 23; Docket Entry No. 50 at 4, 5, 6, 9; Docket Entry No. 51 at 10, 15, 16, 32, 35).

Dtex also points to allegations and evidence that in early 2004, Bancomer's agents attempted to bribe and threatened Dtex's Mexican attorney to induce him to drop the ancillary proceeding in which Dtex sought damages from Bancomer for the stay issued in the Mexico City Amparo proceeding.  The record shows that Dtex's attorney did not drop the ancillary proceeding.  Instead, the attorney pursued that claim through the 2006 appeal, obtaining and retaining a large damages award against Bancomer.  This evidence does not support the argument that the Mexican courts are not an adequate alternative forum.

The record evidence shows that, as a matter of law, the Mexican courts are an available and adequate forum.

### B.    The Private Interest Factors

The private interest factors enumerated in *Gilbert* include: (1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of premises; and (5) all other factors that might make the trial quicker or less expensive. 330 U.S. at 508.

### 1.    *Ease of Access to Sources of Proof*

The first private interest factor, relative ease of access to sources of proof, supports

dismissal.  The witnesses Dtex identifies in its complaints as having been instrumental in or

knowledgeable about Bancomer's efforts to frustrate Dtex's rights to the equipment, are

primarily in Mexico.  The events at issue took place in Mexico.  Most of the documents are

in Mexico.  Among the documents that Bancomer identifies as relevant, based on Dtex's

complaint and affidavits, are transcripts of the relevant Mexican court proceedings, the

pleadings and evidence Bancomer provided to these courts, and court decisions on which Dtex

bases its assertions that Bancomer misrepresented facts and evidence in Mexican courts.

Other examples of relevant Mexican documents include:  the official written testimonial of

the "Denimtex Trustee" itemizing the pieces of Denimtex equipment it seized, (Docket Entry

No. 51 at ¶ 83); the official invoice of the Assistant Secretariat of Strikes of Special Board

Number 6 of the Federal District Court of Settlements and Arbitration (the "Ordinary Labor

Court") in Chihuahua (Case No. III-970/2001) regarding the Denimtex Equipment it

auctioned to Dtex, (*id.*); documents concerning the January 2004 Amparo case brought by

Bancomer to which Hernandez Martinez refers in his affidavit, (*id*. at ¶¶ 60-64, 4); Mexican

police records related to the alleged altercation of January 16, 2004 involving agents of Dtex

and (allegedly) of Bancomer; documents supporting Dtex's claims of maintenance and other

expenses incurred by Dtex's attorneys in Mexico, (*id*. at ¶¶ 70-71, 6); Mexican police records

concerning the impoundment of Dtex's equipment in July 2004, 7); records of the disputed

bankruptcy proceedings before the Third Judge of District "A" [Case No. 3/2001] (the

"Mexican Bankruptcy Court"); and the January 14, 2004 written report regarding the altercation involving Durate Sanchez, the judicial administrator, Hernandez, and various Dtex representatives.

Bancomer asserts that it would also have to obtain the contracts governing its lien on the equipment; notices, transcripts, and other documentation from the Labor Board Auction; and the suspension orders and other decisions rendered in Mexico. Most of the documents are in Spanish; obtaining and translating these documents would be burdensome, time-consuming, and costly in this forum.

The relative ease of access to evidence favors Mexico as the appropriate forum.

### 2. The Availability of Compulsory Process for Unwilling Witnesses

The second private interest factor, the availability of compulsory process for the attendance of unwilling witnesses, weighs heavily in favor of dismissal. Dtex argues that the "significant witnesses are either parties or are under the control of the parties." (Docket Entry No. 50 at 27). The record does not support this argument. (Docket Entry No. 20). Dtex's own allegations make it clear that a number of nonparty Mexican citizens are likely to be important witnesses in this case. They include: the judicial administrator (who is not a Bancomer employee); the Denimtex Trustee; the Mexican court judges; Mexican police officers; the alleged accomplices of the judicial administrator who supposedly threatened Denimtex's workers; the individuals who allegedly barred Dtex's representatives from taking possession of the equipment on November 4, 2003; the Ordinary Labor Court official who accompanied Hernandez Martinez to the Denimtex plant on December 16, 2003; the Mexican

police who allegedly threatened Dtex representatives or interfered with the equipment; and the Ordinary Labor Court official who authored the January 14, 2004 letter regarding the dispute at the Denimtex plant that occurred on January 14, 2004.  (Docket Entry No. 51). Most of these witnesses are Mexican citizens and are not parties or employees of the parties.

This court cannot compel attendance by any unwilling nonparty witness who is in Mexico.  Moreover, Dtex has not identified key party or nonparty witnesses who are in Texas. "[T]o fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition is to create a condition not satisfactory to litigants."  *Perez & Compania (Cataluna), S.A. v. M/V Mexico I*, 826 F.2d 1449, 1453 (5th Cir. 1987).

Dtex cites two cases to support its argument that a court may deny a motion to dismiss on the basis of *forum non conveniens* even if the evidence and witnesses are located in the foreign forum.  In *Direnzo v. Philip Services Corp.*, 294 F.3d 21 (2d Cir. 2002), the court declined to dismiss the action despite the fact that many of the witnesses were in Ontario.  The court found that willing witnesses were within a relatively short distance of New York and could easily travel there.  The court acknowledged that unwilling witnesses could not be compelled to appear and that "the number of witnesses for whom these accommodations would have to be made and the preference for live testimony" weighed in favor of dismissal, despite the availability of "videotaped depositions, obtained through letters rogatory."  *Id*. at 30.  The court relied on other factors (not present in this case) to conclude that the balance did not tip in favor of dismissal.  This case is distinguishable from the present case, in which the

foreign witnesses are scattered in different parts of Mexico from Chihuahua to Mexico City, far from this Texas forum; many are nonparty witnesses; most would be unwilling witnesses whose presence could not be compelled; and no witnesses are in Texas.  The second case Dtex cites, *Wilson v. Humphrey (Cayman) Ltd.*, 916 F.2d 1239 (7th Cir. 1990), involved a claim that the plaintiff had been assaulted in a Cayman Islands hotel.  The location of witnesses in the Cayman Islands did not weigh strongly in favor of dismissal because many of the witnesses were employees of the defendant, which could obtain their cooperation in traveling to testify.  In the present case, by contrast, there are a number of nonparty witnesses in Mexico.  The inability to compel the attendance of numerous unwilling witnesses weighs heavily in favor of dismissal.

### 3.    The Cost of Securing the Attendance of Willing Witnesses

The large number of Mexican witnesses in this case and the fact that many are in different locations add to the cost of securing their attendance, even if they were willing to appear in Texas.  *See Seguros Comercial Americas, S.A. de C.V. v. American President Lines, Ltd.*, 910 F. Supp. 1235, 1247 (S.D. Tex. 1995).  In this case, this expense and the absence of any Texas witnesses contributes to finding that this factor weighs in favor of dismissal.

### 4.    The Ability to View the Premises

The next private interest factor, the ability to view the premises, can only weigh in favor of dismissal.  This factor, however, seems unlikely to play an important role and is given scant weight.

5.    *Other Practical Factors That Make Trial Easy, Expeditious, and Inexpensive*

A court is to consider practical factors, including the ability to implead other entities. *See Piper Aircraft*, at 276-78.  The parties dispute whether Bancomer is likely to implead any third party.  Bancomer argues that it may need to implead the judicial administrator and other parties Dtex identified as having played a role in delaying its ability to assert its rights to the equipment.  A defendant's inability to implead a third party is not dispositive, *see Lehman v. Humphrey Cayman, Ltd*., 713 F.2d 339, 343-44 (8th Cir.1983), but judicial economy favors resolution of all claims in one trial.  Litigating all the claims in Mexico avoids a scenario in which Bancomer must pursue claims for contribution against a third party in Mexico while defending the action against Dtex in the United States, without compulsory process to obtain key witnesses.  *See Morse v. Sun Int'l Hotels*, 2001 WL 34874967 at *4 (S.D. Fla. Feb.26, 2001).  If Bancomer was found liable in this court, it could seek contribution from third parties in Mexico, but this approach runs the risk of inconsistent verdicts.  *See Piper Aircraft*, 454 U.S. at 243; *see Iragorri*, 203 F.3d at 15 (inability to implead favors dismissal).  This factor weighs only slightly toward dismissal, given the uncertainty that any impleader will be necessary.

The practical factors also include difficulties that Dtex may have in enforcing the judgment of a Mexican court against Bancomer.  Dtex asserts that Bancomer would use "unethical tactics" to "substantially delay, impede, and interfere with any effort by Dtex in Mexico to execute on or enforce any judgment obtained by Dtex, either in a Mexican court or in a U.S. court, against Bancomer."  (Docket Entry No. 59 at 38–39).  Dtex argues that its

"only chance of obtaining such enforcement is to obtain a judgment from a U.S. court and enforce it against Bancomer's assets here." (Docket Entry No. 50 at 31).

Dtex alleges that Bancomer used its influence in Mexico to convince its bonding company to challenge Dtex's role in the ancillary proceeding. (Docket Entry No. 68). The record shows that this challenge was unsuccessful. Bancomer has paid the full amount of the damages award issued in that case. (Docket Entry No. 71, Ex. A). The record does not show that Dtex will be unable to enforce a judgment against Bancomer in Mexico. Nor does Dtex explain why it would be unable to enforce a future judgment of a Mexican court against Bancomer's assets in the United States. Dtex has not asked this court to condition dismissal on Bancomer's agreement to satisfy a judgment rendered by a court in Mexico. *Nolan*, 762 F. Supp. at 684. This factor does not weigh against dismissal.

Dtex argues that it would be a financial hardship for it to pursue this action in Mexico. (Docket Entry No. 50 at 30). Dtex cites *Coaches v. Arabian American Oil Co*., 831 F.2d 572 (5th Cir. 1987). In that case, the court granted a motion to dismiss based on *forum non conveniens*, despite the cost of transporting dozens of American witnesses to England. The court acknowledged that transporting these witnesses to England for trial would constitute more of a financial burden on the plaintiffs than would transporting them to Houston, Texas. The court also noted that there were witnesses available in England who could offer similar testimony and expressed some doubt about the need for so many American witnesses. *Id.* at 575. In the present case, Dtex has identified only two critical American witnesses—Dtex's principals—and they are in South Carolina, not Texas. The burden of having them testify in

27

Mexico is far less than the costs and burdens of having the many Mexican witnesses travel to Texas.

Dtex also claims that the foreign forum will be a hardship because of the language barrier.  Although Dtex asserts that this is not a document-intensive case, the record shows that the records of the legal proceedings in Mexico, including transcripts, rulings, and other records, as well as documents relating to the auction and the Denimtex bankruptcy, may be relevant.  Most of the documents are in Spanish and would have to be translated if the case proceeds in this court.

Dtex's arguments ignore the fact that this dispute arises out of a purchase of equipment located in Mexico, which Dtex bought in Mexico in a Mexican auction proceeding sponsored by the Mexican government.  The arguments also ignore Dtex's willingness to, and success in, litigating against Bancomer in Mexican courts to obtain title to and possession of the equipment.  The private interest factors weigh in favor of dismissing this case in favor of a Mexican forum.

### C.    The Public Interest Factors

The public interest factors include:  (i) the administrative difficulties flowing from court congestion; (ii) the local interest in having localized controversies resolved at home; (iii) the interest in having a the trial in a forum that is familiar with the law that must govern the action; (iv) the avoidance of unnecessary problems in conflicts of law, or in application of foreign law; and (v) the unfairness of burdening citizens in an unrelated forum with jury duty.

*See Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 342 (5th Cir. 1999); *In re Air Crash*, 821 F.2d at 1162-63.

### 1. Administrative Difficulties

The record does not contain information as to relative court congestion.  This court notes, however, that the public interest in minimizing administrative difficulties weighs in favor of dismissal in favor of a Mexican forum, given the difficulties in obtaining evidence from Mexico, the lengthy and involved background of the litigation over the equipment in different Mexican tribunals, and the likely application of Mexican law.

### 2. The Interest of the Forum in Resolving the Controversy

The second public interest factor, the interest in resolving local controversies locally, supports dismissal in favor of a Mexican court.  The alleged torts all occurred in Mexico. Mexican courts have a greater interest than an American court in deciding whether Mexico's court system was systematically abused or manipulated to frustrate and delay Dtex's ability to take possession of property purchased in Mexico in an auction arranged by the Mexican government.  The facts of this case have no connection with Texas.  Bancomer conducts business activities in Texas, but that business is unrelated to this case, and its principal business is in Mexico; Dtex has no connection to Texas other than this lawsuit.

### 3. The Governing Law

Mexican law likely will apply to this case, or, at a minimum, be critical.  For both tort and contract cases, Texas follows the "most significant relationship test" set out in the Restatement (Second) of Conflict of Laws § 6 and § 145.  *Torrington Co. v. Stutzman*, 46

S.W.3d 829, 848 (Tex. 2000); *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979).  Some

of the relevant contacts to take into account in a tort case include:

> (a)  the place where the injury occurred;
> (b)  the place where the conduct causing the injury occurred;
> (c)  the domicil[e], residence, nationality, place of incorporation
> and place of business of the parties; and
> (d)  the place where the relationship, if any, between the parties
> is centered.

*Id*. (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971)).  The analysis

"should not turn on the number of contacts, but more importantly on the qualitative nature of

those contacts."  *Gutierrez*, 583 S.W.2d at 319.

Mexico has the most significant relationship to this case.  The parties are domiciled in

South Carolina and Mexico.  Dtex has no connection to Texas aside from this lawsuit;

Bancomer has no connection to South Carolina.  The parties' extensive relationship, aside

from the litigation dismissed for lack of jurisdiction in South Carolina and this Texas

litigation, is exclusively in Mexico.  The allegedly tortious acts, the "conduct which caused

the injury," occurred in Mexico.  Bancomer filed allegedly unlawful lawsuits in Mexican

courts.  The allegedly unlawful possession of the equipment was in Mexico.  The alleged

attacks, bribes, and fraudulent actions all occurred in Mexico.

Dtex argues that if Mexican law applies, it should only apply to the ownership of the

property and Texas law should apply to the torts committed by Bancomer in Mexico.  This

distinction is unexplained.  Dtex also argues that this court should apply Texas law because

Bancomer has voluntarily done extensive business in this State.  Bancomer's unrelated

activities in Texas do not determine the law to apply in this case, which arises from Dtex's

business in Mexico and Bancomer's conduct in Mexico, all relating to textile equipment located in Mexico, auctioned under Mexican law by the Mexican government.

Dtex cites *Ford Motor Co. v. Aguigna*, 9 S.W.3d 252 (Tex. App.–San Antonio 1999, pet. denied.), to argue that Texas has the most significant relationship to this case. In *Aguigna*, a case arising out of a car accident in Mexico, the defendant sought to apply the Mexican law of damages and the plaintiffs sought to apply Texas damages law. In finding that Texas law applied, the court weighed the most significant relationship factors, noting that the plaintiffs were primarily citizens of Texas and the defendant was a United States automaker. The only connection to Mexico was the fact that the accident occurred there. *Id.* at 261. This case differs significantly from *Aguigna*. This case has no connection to Texas except the filing of this lawsuit and unrelated activities by Bancomer. By contrast, there are numerous connections with Mexico, including Dtex's business activities that led to its claim to the disputed equipment and Bancomer's alleged actions to frustrate Dtex's claim.

The expert briefing on Mexican law already submitted to this court shows that this case turns on substantiative questions of Mexican law. Dtex argues that many of the matters of law in this case have already been decided with finality by Mexican courts. Bancomer argues that a Mexican bankruptcy court has yet to rule on important issues of law. Other important factors, such as whether Sanchez is an agent of Bancomer and whether the Mexican courts' previous decisions are binding, are critical to this case and must be decided using Mexican precedent. This factor weighs heavily in favor of transfer.

31

4.     *The Burden on the Citizens*

The final public interest factor, the interest in avoiding an unfair burden on citizens in an unrelated forum with jury duty, weighs in favor of dismissal.  As noted, Mexico has a far greater interest in this case than Texas.  This case has no connection to Texas.  Jury duty should not be imposed on the citizens of Texas in a case that is so slightly connected with this state.  *See Nolan*, 762 F. Supp. at 685 (citing *Pain v. United Tech. Corp.*, 637 F.2d 775, 792 (D.C. Cir. 1980)); *see also In re Bridgestone/Firestone*, 420 F.3d 702, 705 (7th Cir. 2005) ("The citizens of the Western District of Texas have no connection to the Mañez-Reyes accident.  The family does not reside there, the accident did not occur there, and the tires at issue were neither designed nor manufactured there.").

The weight of the public interest factors strongly supports dismissal of this case.  Mexico is the focal point of this case, and Mexican law will most likely apply.  Numerous issues of Mexican law have already been raised by the parties.  Texas has much less connection with, and lower interest in, this case than does Mexico.

**D.     Conclusion**

Mexico is an adequate and available forum for this case and both the private and public factors strongly support dismissal of this case under *forum non conveniens*.  Dtex cites two cases, *Zermeno v. McDonnell Douglas Corp.*, 246 F. Supp. 2d at 646, 659 (S.D. Tex. 2004) and *Wilson v. Humphreys (Cayman) Limited*, 916 F.2d 1239, 1246 (7th Cir. 1990), to support its argument that this court should defer to the American plaintiff's choice of forum.  This

court recognizes this principle but finds that the factors in this case weigh so strongly in favor of dismissal that this case is distinguishable from the cases Dtex cites.

In *Zermeno*, 246 F. Supp. 2d at 662–63, the plaintiffs were Mexican and the defendants were Mexican and American; the deference accorded an American plaintiff's forum choice was not an issue.  In *Wilson*, which involved a claimed assault in a Cayman Islands hotel, the court found that it would be a hardship for the plaintiffs, individuals from Indiana, to litigate in the Cayman Islands and that the relevant factors did not support dismissal on the basis of *forum non conveniens*.  The court found that the American plaintiffs would be strongly disadvantaged by transfer to a foreign forum because they would likely face barriers even to file suit.  They would, for example, be unable to obtain an attorney (attorneys in the Cayman Islands do not take work on a contingent basis), could not receive a jury trial, and would have to post a bond.  The present case involves no such barriers.  Dtex has already successfully litigated related issues in Mexican courts.  As the court in *Wilson* noted, "to the extent that these disadvantages are grounded in differences of substantiative law of the Cayman Islands, they may be given some, but not substantial or conclusive weight."  *Id.* at 1247, n.10.  In *Wilson*, most of the Cayman Islands witnesses were party employees whose presence in the United States could be arranged.  In this case, by contrast, the many Mexican witnesses include a large number of nonparty witnesses, as well as extensive other evidence that would be very difficult to present in a Texas court.  Neither *Zermeno* nor *Wilson* support a different result in this case, in which the balance tips so strongly in favor of dismissal as to outweigh Dtex's choice of this Texas forum.

IV.     **Order**

The motion to dismiss on the basis of *forum non conveniens* is granted.  This action

will be dismissed by separate order.

SIGNED on April 9, 2007, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge